```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| RHODA KANTER, | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 04-5542 (JBS) |
| v. | |
| HANS M. BARELLA, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Deborah M. Gross, Esq.
Tina Moukoulis, Esq.
LAW OFFICES OF BERNARD M. GROSS, P.C.
John Wanamaker Building
Suite 540
Juniper and Market Streets
Philadelphia, PA 19107
    Attorneys for Plaintiff

Robert Goodman, Esq.
Marc J. Gross, Esq.
GREENBAUM, ROWE, SMITH & DAVIS LLP
6 Becker Farm Road
Roseland, NJ 07068
    -and-
Neal R. Marder, Esq.
David M. Hickey, Esq.
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
    Attorneys for Defendant MedQuist Inc.

Jeffrey W. Lorell, Esq.
Jeffrey Soos, Esq.
SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC
One Gateway Center, 13th Floor
Newark, NJ 07102
    -and-
Randall W. Bodner, Esq.
Carisa A. Klemeyer, Esq.
ROPES & GRAY LLP
One International Place
Boston, MA 02110
    Attorneys for Defendants Stowe, Ruttenberg and Underwood

```
Michael R. Griffinger, Esq.
GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECHIONE
One Riverfront Plaza
Newark, NJ 07102
     -and-
Garrard R. Beeney, Esq.
Brian T. Frawley, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
     Attorneys for Defendants Barella, Chew, Curran, Rusckowski,
     Weisenhoff, Westerink, Hommen and Koninklijke Philips
     Electronics N.V.
```

**SIMANDLE**, U.S. District Judge:

The primary issue in this Rule 23.1 shareholder derivative action is whether Plaintiff's failure to make any demand on MedQuist's board of directors prior to instituting this suit may be excused. Because Plaintiff has failed to plead with the requisite particularity facts creating "a reasonable doubt that, as of the time the complaint was filed, the board that would be addressing the demand could have impartially considered its merits without being influenced by improper considerations," In re Sagent Tech., Inc., Derivative Litig., 278 F. Supp. 2d 1079, 1087 (N.D. Cal. 2003) (citing Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993)), the Complaint will be dismissed with prejudice.[1]

---

[1] This action was reassigned to this Court from Judge Joseph H. Rodriguez in light of the related pending action in Steiner v. MedQuist Inc., Civil No. 04-5487 (JBS). The Court heard oral argument on August 10, 2005, at which time it requested the parties to make limited supplemental written submissions, the last of which was received by the Court on August 24, 2005.

**I.    BACKGROUND**

According to the Complaint, Plaintiff Rhoda Kanter is, and has been at all relevant times, the owner of shares of common stock of MedQuist, Inc. ("MedQuist" or the "Company"). The Company, headquartered within the District of New Jersey, is a provider of medical transcription and healthcare information services.[2] The instant dispute centers on the billing practices utilized by MedQuist for its transcription services.

According to the Complaint, the Company's billing system utilizes a computer program to "count" characters in each line of a formal report. (Id. ¶ 29.) The program then creates an invoice which is mailed to MedQuist's customers. The Company's charges are represented to its customers as being calculated on a basis of cost per line within each transcript.[3] (Id. ¶ 30.) MedQuist's pricing contracts with its customers define "line" for purposes of determining cost as an "AAMT line."

---

[2] The MedQuist transcription process involves several steps. (Compl. ¶ 28.) First, doctors at the Company's customer hospitals dictate their reports in free form into a voice recorder that connects with MedQuist via telephone connections. That dictation is forwarded to a transcriptionist, who calls up a template for the particular type of report being prepared. The transcriptionist then types the formal report, which is uploaded directly into the MedQuist computer server. (Id.)

[3] Additionally, the Company and its customers agree to other pricing variables such as turnaround time for the transcripts. (Compl. ¶ 29.) The charges also vary among reports – for example, the contractual cost per line of an operative report differs from the cost per line of a discharge summary.

> An AAMT line is defined as any line having 65 "characters." A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any characters contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface system.

(Id. ¶ 32.) According to the Complaint, MedQuist systematically inflated its line counts by, for instance, counting the same letter as multiple characters. (Id. ¶ 33.)

On March 16, 2004, MedQuist filed a Form 12b-25 Notification of late filing with the Securities and Exchange Commission ("SEC") disclosing that the filing of its Form 10-K for the year ending December 31, 2003 would be delayed pending completion of an independent review of the Company's billing practices. (Id. ¶ 24.) The Complaint alleges that this review was initiated in response to assertions made by a Company employee regarding the alleged unlawful billing scheme. (Id.) On July 30, 2004, MedQuist announced key findings of the independent review conducted by Debevoise & Plimpton LLP and PricewaterhouseCoopers, LLP. (Id. ¶¶ 25-26.)

In short, the independent review allegedly revealed an unlawful billing scheme. Those findings were announced to the

Board of Directors, which ultimately took disciplinary action against five Company employees. (Id. ¶ 25.) On September 9, 2004, a class action was filed in the Central District of California arising from the alleged billing scheme. (Id. ¶ 27.) On October 29, 2004, MedQuist issued a press release announcing that its Board of Directors had concluded that the Company's previously issued financial statements included in its Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, should no longer be relied upon. (Id. ¶ 39.)

On November 12, 2004, Plaintiff filed this derivative action on behalf of MedQuist pursuant to Rule 23.1, Fed. R. Civ. P., against Koninklijke Philips Electronic N.V. ("Philips"), which is alleged to be MedQuist's controllong shareholder, and ten individual current and former MedQuist directors.[4] As discussed more fully below, Plaintiff alleges that for the period 2001 through 2004 Defendants violated their fiduciary duties to the Company by (1) permitting artificial inflation of billing figures; (2) failing to adequately ensure accurate and lawful billing practices; and (3) failing to accurately report the Company's true financial condition in its published financial statements. (Id. ¶ 23.)

---

[4] MedQuist has been named as nominal defendant.

According to Plaintiff, all of the named individual defendants were serving as board members at the time the Complaint was filed.[5] (Pl. Br. at 5.)  According to MedQuist, at the time the Complaint was filed the MedQuist board was comprised of six directors, three of whom were independent (Messrs. Ruttenberg, Stowe and Underwood) and three of whom were employed by Defendant Philips or a Philips related entity (Messrs. Hommen, Rusckowski and Weisenhoff).  (MedQuist Br. at 3-4.)  Philips owns 71% of the common stock of MedQuist and is alleged in the Complaint to control MedQuist.[6] (Compl. ¶ 14.)

Plaintiff concedes that she failed to make any demand on the Board pursuant to Rule 23.1, Fed. R. Civ. P., prior to instituting this action.  Defendants have moved to dismiss the Complaint in its entirety, asserting, *inter alia*, insufficient pleading of demand futility and liability bar defenses.

This Court has diversity jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332.

---

[5] The Complaint names as Defendants Richard H. Stowe, A. Fred Ruttenberg and John H. Underwood (collectively "Outside Directors"), as well as Hans. M. Barella, Belinda W. Chew, William E. Curran, Stephen H. Rusckowski, Scott M. Weisenhoff, Erik J. Westernik, Jan H.M. Hommen (collectively "Philips Directors") and Philips.  The Complaint also alleges that Curran, Ruttenberg, Stowe and Underwood were members of the Company's audit committee.

[6] Among other things, the Complaint alleges that Philips controls MedQuist and its Board by virtue of the "Governance Agreement" whereby the MedQuist Board is to consist of eleven directors, six of whom are to be designated by Philips.  (Compl. ¶ 14(b).)  Additionally, the Complaint cites a licensing agreement between MedQuist and Philips as evidence of the control by Philips over the Company.  (*Id.* ¶ 14(c).)

**II. DISCUSSION**

    A.    <u>Demand Futility</u>

Defendants argue that the Complaint should be dismissed pursuant to Rule 23.1, Fed. R. Civ. P., because Plaintiff failed to make any demand on the board of directors prior to commencing this action. Plaintiff argues that demand on the board would have been futile and, thus, that the Court should excuse any such failure.[7] For the reasons now explained, that failure was fatal to the Complaint.

Rule 23.1, Fed. R. Civ. P., which governs shareholder derivative actions, provides in pertinent part:

> In a derivative action brought by one or more shareholders . . . to enforce a right of a corporation . . ., the corporation . . . having failed to enforce a right which may be properly asserted by it, the complaint shall be verified and shall allege (1) that

---

[7] Defendant MedQuist initially argues that Plaintiff's claims are not ripe for resolution because Plaintiff seeks damages that rest upon contingent future events – namely, the resolution of the related pending class action. Ripeness doctrine examines whether a dispute has yet matured to a point that warrants decision. "[T]he question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of" a judgment. <u>Lake Carriers' Assn. v. MacMullan</u>, 406 U.S. 498, 506 (1972) (quoting <u>Maryland Cas. Co. v. Pacific Coal & Oil Co.</u>, 312 U.S. 270 (1941)). The inquiry centers both on Article III concepts and on discretionary policy considerations. 13A Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, <u>Federal Practice and Procedure</u> § 3532 (2d ed. 1984). While the Court here concludes that there is a case or controversy within the meaning of Article III and, thus, that the Court has power to issue a judgment, because the Complaint is not adequately pled, the Court need not determine whether this claim for damages is ripe for resolution.

>      the plaintiff was a shareholder . . . at the time of
>      the transaction of which the plaintiff complains . . .,
>      and (2) that the action is not a collusive one to
>      confer jurisdiction on a court of the United States
>      which it would not otherwise have.  The complaint shall
>      also allege with particularity the efforts, if any,
>      made by the plaintiff to obtain the action the
>      plaintiff desires from the directors or comparable
>      authority . . ., and the reasons for the plaintiff's
>      failure to obtain the action or for not making the
>      effort.

The demand requirement in Rule 23.1 "speaks only to adequacy of the shareholder representative's pleadings," and does not itself create a demand requirement. Kamen v. Kemper Financial Services, Inc. 500 U.S. 90, 97 (1990).  "[T]he function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'" Id.  Thus, courts hearing a shareholder derivative action apply federal procedural rules in determining whether the allegations in the complaint satisfy the particularity requirement, and state substantive law to determine whether demand would have been futile so as to excuse demand.

    "The purpose of requiring that the complaining shareholder demand action from the board of directors before bringing suit under Rule 23.1 is related to the concept that a shareholder derivative suit is a device to be used only when it is clear that the corporation will not act to redress the alleged injury to itself."  7C Charles Alan Wright, Arthur R. Miller and Mary K.

Kane, Federal Practice and Procedure § 1831 (2d ed. 1986). The demand requirement "recognizes the right of the corporate directory to corporate control; in other words, to make the corporation paramount, even when its rights are to be protected or sought through litigation." Delaware & Hudson Co. v. Albany & Susquehanna R.R. Co., 213 U.S. 435, 447 (1909). The power of a board of directors to continue or to discontinue a cause of action on behalf of the corporation is governed by the state law of the state of incorporation. Kamen, 500 U.S. at 96. Similarly, in diversity cases, such as this one, the relevant substantive law is the law of the state of incorporation. Abrams v. Koether, 766 F. Supp. 237, 249 (D.N.J. 1991) (citing RCM Securities Fund, Inc. v. Stanton, 928 F.2d 1318 (2d Cir. 1991)). The state of incorporation of MedQuist is New Jersey and, thus, the law of this State will govern the question of demand futility. As New Jersey courts look to Delaware law for evaluating claims of demand futility, see In re PSE&G S'holder Litig., 173 N.J. 258 (2002), this Court will do the same.

Where a complaint challenges an actual decision of a board of directors, the test articulated in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), governs. That decision held that in determining demand futility, the court "in the proper exercise of its discretion must decide whether under the particularized facts alleged a reasonable doubt is created that: (1) the directors

9

are disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Id. at 814. Where, however, as here, a plaintiff challenges board inaction rather than a specific business judgment of the board – i.e., "directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates)" – the Aronson rule does not apply. Rales v. Blasband, 634 A.2d 927, 934 n.9 (Del. 1993). Rather, in such cases "demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand."[8] Id. More specifically, in cases of director nonfeasance,

> a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

Id. at 934. "In order to determine whether the Board could have impartially considered a demand at the time [the] original complaint was filed, it is appropriate to examine the nature of the decision confronting it." Id. at 935.

---

[8] To be sure, as Vice Chancellor Strine explained in Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. 2003), in certain circumstances "the differences between the Rales and the Aronson tests . . . are only subtly different, because the policy justification for each test points the court toward a similar analysis."

> A stockholder demand letter would, at a minimum, notify the directors of the nature of the alleged wrongdoing and the identities of the alleged wrongdoers. . . . The task of the board of directors in responding to a stockholder demand letter is a two-step process. First, the directors must determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand. . . . Second, the board must weigh the alternatives available to it, including the advisability of implementing internal corrective action and commencing legal proceedings.  In carrying out these tasks, the board must be able to act free of personal financial interest and improper extraneous influences.

Id. at 935.  Here, Defendants argue that Plaintiff failed to adequately plead how the directors lacked independence or were interested. Even the most generous reading of the Complaint supports Defendants' argument.

### 1. Director Interest

"A director may have a disabling interest for pre-suit demand purposes" where the potential liability rises to a "substantial likelihood."  In re Sagent Tech., Inc. Derivative Litig., 278 F. Supp. 2d 1079, 1089 (N.D.Cal. 2003).  "A plaintiff may not 'bootstrap allegations of futility' by pleading merely that 'the directors participated in the challenged transaction or that they would be reluctant to sue themselves.'" Id. (quoting Blasband v. Rales, 971 F.2d 1034, 1049 (3d Cir. 1992) (citing Delaware law)).  Here, Plaintiff has not pleaded facts

11

demonstrating a substantial likelihood of success on the breach of fiduciary duty claim.[9]

The heart of Plaintiff's claim for breach of fiduciary duty is contained in ¶ 41 of the Complaint:

> Defendants violated their fiduciary duties by recklessly ignoring and failing to correct the long-term, persistent, and recklessly deficient reporting of AAMT lines upon which billing revenues were based, revenues which were included in Medquist's reported financial results and which artificially inflated Medquist's revenues and income throughout the period from 2001 through 2004.  Defendants also were responsible for creating and helping to sustain the dangerous corporate culture in which production and profitability were valued greater than the truth, compliance with applicable law and regulations and accurate financial reporting.  This culture was fostered by the pressure placed by the Medquist Board which was controlled by Philips for Medquist to achieve certain forecast targets.  Defendants failed to provide oversight, control, or resources to assure that the Company would operate within the bounds of the law.

The general allegations contained in paragraph 41, as in the rest of the Complaint, are insufficient.  Most glaringly, the Complaint alleges reckless oversight by all Defendants during the

---

[9] Plaintiff's effort to demonstrate a substantial likelihood of liability is also stifled by the exculpation provision contained in MedQuist's Certificate of Incorporation.  See Guttman, 823 A.2d at 501 ("[T]he threat of liability that directors face can be influenced in a substantial way if the corporate charter contains an exculpatory charter provision . . . .")  Specifically, the Company's charter provides a limitation on director liability consistent with N.J.S.A. 14A:2-7(3). (MedQuist Certificate of Incorporation, Article Ninth, Gross Decl. Ex. A.)  That Plaintiff here has not satisfied its burden of pleading facts supporting a claim that is not barred by that charter provision, Malpiede v. Townson, 780 A.2d 1075, 1094 n.64 (Del. 2001), only further supports the conclusion that the Directors are not interested.

relevant period while, at the same time, acknowledging that at least three of the director defendants were not even directors during part of that period.  (Compl. ¶¶ 12(c), 12(d) and 12(f).)  In short, the Complaint "does not single out, among current or past directors, which directors participated in the alleged wrongdoing . . . .  No individual directors or group of directors are set apart; in fact, many allegations do not differentiate among the directors and the other defendants.  Nor does the . . . complaint plead any facts showing that past directors had actual knowledge of the alleged wrongdoings at the time they were committed."  In re Prudential Ins. Co. Derivative Lit., 282 N.J. Super. 256, 277 (1995).  Such conclusory allegations do not satisfy the heightened pleading requirements of Rule 23.1.  See Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988).

Additionally, Plaintiff fails to point to any "red flags" that may have put the Directors on notice of any wrongdoing – for example, any instance where the directors turned a blind eye to unlawful billing practices of which they were aware.  In Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003), the defendants likewise moved to dismiss a shareholder derivative action for failure to make a demand on the board under Rule 23.1.  In what the court identified as a claim under In re Caremark Int'l, Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996), the plaintiffs alleged that certain defendants failed to oversee the preparation of the

13

company's financial statements.  In short, the court held that in order to properly plead a Caremark claim, the plaintiff would have to show that the directors were conscious of the fact that they were not doing their jobs.[10] Guttman, 823 A.2d at 506.

As in Guttman, Plaintiff's claims here are "empty of the kind of fact pleading that is critical to a Caremark claim, such as contentions that they company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."  823 A.2d at 507.  In fact, Plaintiff concedes that MedQuist had an audit committee which regularly communicated with MedQuist employees.  (See Compl. ¶ 13, 21.)

To be sure, Plaintiff alleges in broad terms that the Directors knew, by virtue of their position within the corporation, of the allegedly unlawful billing scheme.[11] However,

---

[10] As stated by Chancellor Allen in In re Caremark, "[g]enerally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . in my opinion only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability."  698 A.2d at 971.

[11] As a last-ditch effort, Plaintiff argues that at the very least the Court should presume Defendants' knowledge of MedQuist's allegedly unlawful billing practices solely by virtue of their positions as officers and directors.  (Pl. Br. at 18.) The Court will not make such a presumption in the absence of

14

not only do such allegations lack the requisite particularity, see Rattner v. Bidzos, 2003 WL 22284323, at *10 n.53 (Del. Ch. 2003) (holding conclusory assertions of knowledge of wrongdoing, imputed only from the fact of defendant's position within the company, insufficient to satisfy pleading requirements), they are belied by the facts actually pled.  Indeed, the Complaint acknowledges that the Directors responded appropriately to allegations by a Company employee of a fraudulent billing scheme by ordering an independent review of the Company's billing practices by Debevoise & Plimpton LLP and PricewaterhouseCoopers LLP.  (Compl. ¶¶ 24-26.)  According to the Complaint, the key findings of that review were then presented to the Board which, as a result, took disciplinary action against five MedQuist employees.  (Id.)  The Directors appear from the Complaint to have responded swiftly given the first sign of potential impropriety.  Far from alleging facts supporting a substantial likelihood of liability, Plaintiff here has painted a picture of a board of directors that acted responsively given the circumstances.

    Finally, it should be noted that Plaintiff was not without the means with which to obtain particular facts relating to the internal affairs of the Company and, if warranted, to present the

---

specific factual allegations.  See Rattner v. Bidzos, 2003 WL 22284323, at *10 n.53 (Del. Ch. 2003).

pre-suit demand.  Specifically, Plaintiff should have inspected MedQuist's books and records prior to filing her complaint.  See N.J.S.A. 14A:5-28.  N.J.S.A. 14A:5-28(4) provides:

> Nothing herein contained shall impair the power of any court, upon proof by a shareholder of proper purpose, irrespective of the period of time during which the shareholder shall heave been a shareholder of record, and irrespective of the number of shares held by him, to compel the production for examination by such shareholder of the books and records of account, minutes, and record of shareholders of a corporation.

Moreover, "[i]t has been repeatedly held that a common stockholder has the right of inspection of the books and records of a corporation to determine whether there has been proper management of the business . . . ."  Wyckoff v. Hardware Supply Co., 134 N.J.L. 172, 173-74 (1946); see Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 526 (1947) (noting the importance of corporate books and records in a derivative action).

There is no question here that Plaintiff had the "tools at hand" to investigate the alleged mismanagement and other wrongdoings that formed the basis of the Complaint, thereby allowing her to ascertain the existence of particular relevant facts.  Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000) (rejecting derivative plaintiff's objection that requiring particularized pleading is "basically unfair"); Security First Corp. v. U.S. Die Casting & Dev. Corp., 687 A.2d 563, 567-69 (Del. 1997) (holding

investigation of corporate mismanagement is a "proper purpose" for a books and records inspection under Delaware law). Nonetheless, Plaintiff failed to take advantage of these available "tools."

> Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a complaint, the plaintiff[] ha[s] unsurprisingly submitted . . . [a] complaint that lacks particularized facts compromising the impartiality of the [corporate] board that would have acted on a demand. When the case most cries out for the pleading of real facts – e.g., about the board's knowledge of the accounting problems at the company or the company's audit committee process – the complaint is at its most cursory, substituting conclusory allegations for concrete assertions of fact.

Guttman, 823 A.2d at 493-94.

For the foregoing reasons, Plaintiff has failed to demonstrate the requisite director interest.

### 2. Director Independence

Second, Plaintiff also fails to show that the director defendants are not independent. "Independence" means "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Rales, 634 A.2d at 936 (citing Aronson, 473 A.2d at 816). "At bottom, the question of independence turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind. That is, the [Delaware] Supreme Court cases ultimately focus on impartiality and objectivity." Parfi Holding AB v. Mirror Image

Internet, Inc., 794 A.2d 1211, 1232 (Del. Ch. 2001). Similarly, a director lacks independence where he is "beholden" to interested directors or "so under their influence that [his] discretion would be sterilized." Rales, 634 A.2d at 936-37 (citations omitted).

Here, Plaintiff alleges that at the time the Complaint was filed, MedQuist and seven Philips designated directors – Curran, Barella, Chew, Ruscowski, Weisenhoff, Westernik and Hommen – were controlled by Philips.[12] (Compl. ¶¶ 14-16, 18-19, 40, 44-45, 47.) Specifically, Plaintiff argues that by virtue of its 71% ownership of MedQuist and its multimillion dollar licencing contract with MedQuist, Philips controlled the MedQuist Board. Plaintiff therefore concludes that it would be unreasonable to expect the majority of the Board to have been able to impartially consider a demand by Plaintiff. (Pl. Br. at 23-24.) In a similarly conclusory fashion, Plaintiff argues that the remaining directors, Stone and Underwood, are "beholden to and/or controlled by Philips, and therefore may be deemed to lack the requisite independence."[13] (Id. at 27.)

---

[12] As already noted, Defendant MedQuist has represented to the Court that there were six directors at the time the Complaint was filed, only three of whom were appointed by Philips (Messrs. Hommen, Rusckowski and Weisengoff).

[13] Plaintiff also argues, unconvincingly, that Defendant Ruttenberg's independence is doubtful based on his partnership in Blank, Rome, Comisky & McCauley, a law firm which has acted as "special counsel to the Company for certain matters." (Compl. ¶

18

Defendants, on the other hand, argue that Philips' 71% ownership of MedQuist does not create a reasonable doubt as to the directors' independence. (MedQuist Br. at 24.) First, Philips' interests are aligned with the interests of other MedQuist shareholders and, thus, as majority shareholder Philips would have the same (or greater) incentive to sue any wrongdoers who harmed MedQuist. (Id. at 26.) According to MedQuist, Plaintiff should not succeed on a demand futility argument merely by naming Philips as a Defendant. Otherwise, Defendant contends, demand would be excused in every suit where a majority shareholder were named as a defendant. (Id. at 27.) The Court agrees.

In Kaster v. Modification Sys. Inc., 731 F.2d 1014 (2d Cir. 1984), the court upheld the lower court's determination that in light of the general nature of the allegations made by shareholders in a derivative action, demand would not be excused as futile merely because the alleged wrongdoer owned 71% of the voting shares. Similarly here, 71% ownership by Philips, with

---

9.) Plaintiff asserts that "Ruttenberg is beholden to Philips and the Philips Designated Directors to preserve this business relationship between [MedQuist] and his law firm." (Pl. Br. at 26.) The Complaint fails, however, to specify the amount of fees that Blank, Rome received for that work or how Ruttenberg's compensation as partner depends on the work that he brings in. See Rales, 823 A.2d at 503. In any event, a director's provision of legal assistance to the company as outside counsel is, by itself, generally insufficient to establish lack of director independence. See, e.g., In re Ply Gem Indus., Inc. S'holders Litig., 2001 Del. Ch. LEXIS 84, at *30 (June 26, 2001).

nothing more, is inadequate to excuse demand.  Indeed, as the court in Aronson pointed out, that a director is nominated or elected at the behest of those controlling the outcome of a corporate election is insufficient to show lack of independence because "[t]hat is the usual way a person becomes a corporate director."  473 A.2d at 816.  Instead, [i]t is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." Id.  Here, because Plaintiff has failed to plead with particularity any facts demonstrating that MedQuist and its directors are beholden to Philips, the fact that Philips owns a majority interest in the company, by itself, does not establish demand futility.

### III. CONCLUSION

As explained above, the Complaint should be dismissed due to Plaintiff's failure to make a demand on the Board pursuant to Rule 23.1 and the requirements of New Jersey's law of corporate governance.  As the discussion above explains, Plaintiff has alleged certain conduct in the Complaint without pleading with particularity the necessary facts.  Rule 23.1 of the Federal Rules of Civil Procedure requires more.  Accordingly, the Complaint will be dismissed.


**September 21, 2005**                   s/ Jerome B. Simandle
Date                                     JEROME B. SIMANDLE
                                         U.S. District Judge